IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>GEORGE C. TUNIS | Case Nos.  25-cr-243-ABA<br>25-cr-244-ABA<br>25-cr-245-ABA |

**MEMORANDUM OPINION**

Defendant George C. Tunis owns an amphibious "Iguana" powerboat with "tracks" underneath that, when deployed, permit it to "move over land." (The quotations are from the parties' factual stipulation.) He drove it onto the beach at Assateague National Seashore and was cited for violating 36 C.F.R. § 4.10, which forbids "motor vehicles" from operating off-road in non-designated areas of national parks. The violations constitute misdemeanors, and Mr. Tunis has challenged the convictions. Because the Iguana is a motor vehicle when operated on land and the lower beach area is explicitly within the scope of the regulation, and because the regulations are not grievously ambiguous on either issue, the Court will affirm the convictions.

**I.   BACKGROUND**[1]

Assateague Island is within the Assateague National Seashore, a national park. *See* ECF No. 4 at 11–12. The national park covers not only the Island itself, but extends a half mile into the surrounding waters. ECF No. 7 at 2 (citing Pub. L. 89-195, 79 Stat.

---

[1] As noted above, the parties have stipulated to the relevant facts. *See* Case No. 25-cr-243-ABA, ECF No. 7-1. That stipulation, and the other filings in this case, were filed in the dockets of all three case numbers (one for each citation that was issued to Mr. Tunis). Going forward, when the Court refers to ECF numbers, it refers only to entries in the docket of Case No. 25-cr-00243-ABA. Though the docket entry numbering of the three citation appeals is slightly different, each has the same substantive filings.

1

824, 824 (Sept. 21, 1965)); *see also* ECF Nos. 7-2 & 7-3 (maps). There is no dispute that Mr. Tunis was within the national park when, on at least four occasions between September 2020 and October 2024, he drove his Iguana onto the "foreshore" near the northern end of Assateague. *See* ECF No. 4 at 1. The "foreshore" refers to the part of the beach that becomes submerged at high tide. ECF No. 4-1 at 46. The foreshore, although undisputedly within the national park, is owned by the State of Maryland; the federal government owns the beach above the mean high-tide line, as well as the rest of the island. ECF No. 7-1 ¶¶ 10–11. That delineation of ownership is the product of an agreement between the State of Maryland and the federal government in 1996. ECF No. 7-4 at 7. That Concurrent Jurisdiction Agreement did not affect the boundaries of Assateague National Seashore, but rather addressed ownership of certain lands *within* the Seashore. *Id.* at 1–6.

The Iguana is capable of operating both on water as a boat and on land using an electric-drive continuous track mechanism. *Id.* at 1. The following are two photos of it, reflecting its dual modes of operation (ECF No. 7-1 at 6–7):

2





On three separate dates (June 11, 2022, September 19, 2022, and October 5, 2024), Mr. Tunis drove his Iguana from the water onto the foreshore at Assateague, and National Park Service (NPS) police officers issued Mr. Tunis citations under 36 C.F.R. § 4.10(a). ECF No. 7-1 at 8–10. That regulation prohibits "[o]perating a motor vehicle . .

. except on park roads, in parking areas and on routes and areas designated for off-road motor vehicle use." The NPS regulations define "motor vehicle" as "every vehicle that is self-propelled and every vehicle that is propelled by electric power, but not operated on rails or water, except an electric bicycle, a snowmobile, and a motorized wheelchair." 36 C.F.R. § 1.4.

Because a violation of 36 C.F.R. § 4.10(a) is a misdemeanor, these cases were presided over in the first instance by a magistrate judge, Judge C. Bruce Anderson. *See* 18 U.S.C. § 3401(a). Mr. Tunis filed a motion to dismiss the charges, on which Judge Anderson held a hearing in August 2025. ECF No. 4-1. Mr. Tunis made two primary arguments: (1) that the Iguana is not a "motor vehicle" within the meaning of the regulations, and (2) that § 4.10(a) does not reach conduct on the foreshore because that land, although within the national park, is owned by the State of Maryland. *Id*. Mr. Tunis also argued that, at minimum, the regulations are ambiguous and thus his convictions should be vacated under the rule of lenity. *Id*. Judge Anderson disagreed with Mr. Tunis on all three fronts and denied the motion to dismiss. *Id*. at 43–49. The parties then proceeded to a trial on the stipulated facts and Judge Anderson found Mr. Tunis guilty. *Id*. at 53. (There is no right to a trial by jury for "petty offense[s]" for which "the maximum term of imprisonment is six months," *United States v. Nachtigal*, 507 U.S. 1, 4 (1993), so Judge Anderson held a bench trial.) Mr. Tunis has now appealed to this Court and raised the same arguments.

## II. DISCUSSION

Under Federal Rule of Criminal Procedure 58(g)(2)(D), a district judge reviewing a criminal conviction entered by a magistrate judge applies the "same standards of review applied by a court of appeals in assessing a district court conviction." *United*

4

*States v. Bursey*, 416 F.3d 301, 305 (4th Cir. 2005). "Findings of fact . . . are reviewed for clear error, and issues of law (such as the interpretation of statutes and regulations) are reviewed de novo." *Id.* at 306. Here, there are no disputes of fact; the only disputes are legal, namely (1) whether the Iguana is a "motor vehicle" within the meaning of the NPS regulations, (2) whether the prohibition on motor vehicles in Assateague includes the foreshore, which although undisputedly part of the national park is owned by the State of Maryland, and (3) whether the rule of lenity requires vacatur of the convictions.

      **A.**    **The Iguana is a motor vehicle**

As noted above, the NPS regulation at issue prohibits "[o]perating a motor vehicle . . . except on park roads, in parking areas and on routes and areas designated for off-road motor vehicle use." 36 C.F.R. § 4.10(a). And "[m]otor vehicle means every vehicle that is self-propelled and every vehicle that is propelled by electric power, but not operated on rails or water, except an electric bicycle, a snowmobile, and a motorized wheelchair." 36 C.F.R. § 1.4.

Mr. Tunis does not dispute that he was "[o]perating" the Iguana within Assateague, a national park, and that the foreshore is not a "park road[]," a "parking area[]," or an "area[] designated for off-road motor vehicle use." He also does not dispute that the Iguana is "self-propelled" and/or "propelled by electric power"—and of course that it is not "an electric bicycle, a snowmobile, and a motorized wheelchair." He further concedes that, at the time of the citations, the Iguana was not being "operated on . . . water." Rather, the question presented is this: Because the Iguana is *capable* of operating on water, is it excluded from the definition of motor vehicle by the "not operated on rails or water" clause? Mr. Tunis contends his vehicle's aquatic capabilities bring it outside the definition of "motor vehicle." *See* ECF No. 4 at 7–10. The

5

government argues that the applicability of § 4.10 turns on how a given vehicle is being operated at any given time, not whether it is capable of operating in different ways at other times. ECF No. 7 at 5–7.

As Mr. Tunis notes, although neither party has identified any case interpreting the definition of "motor vehicle" under the NPS regulations, there are several cases grappling with the phrase "motor vehicle" generally. *See* ECF No. 4 at 18–19. And those cases often cite what has been called "the most famous hypothetical in the common law world." Frederick Schauer, *A Critical Guide to Vehicles in the Park*, 83 N.Y.U. L. Rev. 1109, 1109 (2008). "If you went to law school in the past sixty years, you may have come across the following question: 'A legal rule forbids you to take a vehicle into the public park. Plainly this forbids an automobile, but what about bicycles, roller skates, toy automobiles? What about airplanes?'" *Truck Trailer Mfrs. Ass'n, Inc v. EPA*, 17 F.4th 1198, 1204 (D.C. Cir. 2021) (quoting H.L.A. Hart, *Positivism and the Separation of Law and Morals*, 71 Harv. L. Rev. 593, 607 (1958)); *see also* Schauer, *A Critical Guide*, 83 N.Y.U. L. Rev. at 1110–11 (discussing a different legal scholar's version of the hypothetical: "What if a group of patriots . . . sought to 'mount on a pedestal' in the park, as a war memorial, a military truck 'in perfect working order'?") (citing Lon L. Fuller, *Positivism and Fidelity to Law—A Reply to Professor Hart*, 71 Harv. L. Rev. 630, 663 (1958)).

But the question of whether the Iguana is a "motor vehicle" within the meaning of 36 C.F.R. § 1.4 is neither abstract nor epistemological. Rather, it is governed by well-settled methods for interpreting statutes and regulations. "When interpreting a statute, we first consider the plain meaning of the statutory language." *Schilling v. Schmidt Baking Co., Inc.*, 876 F.3d 596, 601 (4th Cir. 2017). The Court "must also consider 'the

6

specific context in which that language is used, and the broader context of the statute as a whole.'" *United States v. Spirito*, 36 F.4th 191, 204 (4th Cir. 2022) (quoting *Yi v. Fed. Bureau of Prisons*, 412 F.3d 526, 530 (4th Cir. 2005)). In other words, courts "do not . . . construe the meaning of statutory terms in a vacuum." *Tyler v. Cain*, 533 U.S. 656, 662 (2001). These same methods apply to interpreting regulations. *See Black & Decker Corp. v. Comm'r*, 986 F.2d 60, 65 (4th Cir. 1993) ("Regulations, like statutes, are interpreted according to canons of construction.").

Turning back to the text, "motor vehicle" means "every vehicle that is self-propelled and every vehicle that is propelled by electric power, but not operated on rails or water, except an electric bicycle, a snowmobile, and a motorized wheelchair." 36 C.F.R. § 1.4. The Iguana *can* operate on water, but it also can operate on land—and was being operated on land (the foreshore) when the citations were issued. The text of section 1.4 does not expressly state whether the "rails or water" exclusion applies based on the capabilities of a vehicle or its operating status at a moment in time—*i.e.*, whether the Iguana is always excluded from the definition because it is *capable* of being operated on water (Mr. Tunis's position), or whether it is only excluded from the definition while it is actively being operated on water (the government's position). But the structure and context of the regulations clearly establish that an amphibious craft such as the Iguana is a "motor vehicle" within the meaning of section 1.4 when it is operated on land.

First, grammar. In defining "motor vehicle" in part as a "vehicle . . . not operated on rails or water," the NPS chose the word "operated." It did not say "capable of being operated on rails or water" or describe vehicles that "may be operated on rails or water." It said that if a vehicle is "operated" on rails or water, it is not a motor vehicle. That word choice is strong evidence that the NPS understood the "rails or water" exclusion to

7

apply only if *and while* a vehicle "operates" on rails or water. This point is confirmed by the sentence structure and use of present tense: the exclusion applies if a vehicle "is . . . operated on rails or water." The NPS is far more likely to have intended "is . . . operated" to mean "is in the process of being operated" than as "is capable of being operated." The grammatical structure of the "motor vehicle" definition shows that the question of whether something is a "motor vehicle" turns on how it was being operated when the citation was issued.

Second, this conclusion is confirmed by contrasting the definition of "motor vehicle," and specifically NPS's incorporation of a "not operated on rails or water" requirement, with other definitions within section 1.4. When the NPS defined "vehicle," it adopted a definition that focused on whether the object is *capable* of operating "on land": "Vehicle means every device in, upon, or by which a person or property is *or may be* transported or drawn on land, except snowmobiles and devices moved by human power or used exclusively upon stationary rails or track." 36 C.F.R. § 1.4 (emphasis added).[2] The Iguana undisputedly qualifies as a "vehicle" under this broad definition. It transports people or property, and it "may" be operated over land. In contrast, within the definition of "motor vehicle," when NPS excluded vehicles "not operated on . . . water" it did not adopt a standard based on capability, but rather operation: a "motor vehicle" is a vehicle that is "not operated on rails or water." The fact that NPS adopted

---

[2] The Iguana is a continuous track vehicle akin to a tank. So it is not excluded from the definition of vehicle by the "exclusively upon stationary rails or track" clause, which would apply to exclude, for example, trains; the Iguana's "track" is not "stationary." *See Rodriguez v. Cnty. of Stanislaus*, 799 F. Supp. 2d 1131, 1135 (E.D. Cal. 2011) (explaining that Cal. Vehicle Code § 670, which uses nearly identical language in defining vehicles, "explicitly excludes trains from the definition of 'vehicle' by excepting any device 'used exclusively upon stationary rails or tracks'").

8

different formulations in these definitions is strong evidence that, as applied here, the exclusion within the "motor vehicle" definition for "vehicle[s] . . . operated on rails or water" turns on whether the vehicle was actively operating "on rails or water" at the relevant moment. In other words, even if the definition of "motor vehicle" standing alone might suggest, as Mr. Tunis argues, that the phrase "operated on rails or water" could mean *capable of* "operat[ing] on rails or water," the "vehicle" definition shows that NPS knew how to draft a definition that turns on a vehicle's *capability*—and chose not to do so when it adopted the "operated on rails or water" exclusion.

And it is not just the definition of "vehicle" that illustrates this contrast with the "not operated on rails or water" exclusion. The NPS regulations also use broad language focused on capability when defining several other means of transport. For example:

- "Vessel means every description of watercraft, or other artificial contrivance used, or *capable of being used*, as a means of transportation on the water."

- "Un-manned submersible means any device operated by remote control, used or *capable of being used*, to search or collect below the surface of the water."

- "Bicycle means every device propelled solely by human power upon which a person or persons *may ride on land*, having one, two, or more wheels, except a manual wheelchair."

36 C.F.R. § 1.4 (emphases added).

It is a "well-settled principle[] of statutory interpretation" that a legislature "generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019) (quotation omitted); *see also Yonek v. Shinseki*, 722 F.3d 1355, 1359 (Fed. Cir. 2013) (applying the same rule to the context of agencies and regulations). This principle requires rejecting

9

Mr. Tunis's argument that "operated on . . . water" applies to the Iguana merely because it is capable of being operated on water. Instead, the context and structure of the regulation establish that the Iguana is a motor vehicle when it operates on land, even though it is also capable of being operated on water at other times.

Third, the practical implications of excluding the Iguana from the definition of motor vehicles further undermine Mr. Tunis's proposed construction of the regulation. "[C]ourts should avoid interpretations that 'would produce absurd results' contrary to congressional intent." *Akkus v. Rocket Mortg., LLC*, 715 F. Supp. 3d 726, 731 (D. Md. 2024) (quoting *United States v. Joshua*, 607 F.3d 379, 387 (4th Cir. 2010)); *see also Lozman v. City of Riviera Beach, Fla.*, 568 U.S. 115, 121 (2013) (finding that a floating home was not a "vessel" in part because the Court "must apply [statutory] definition[s] in a 'practical,' not a 'theoretical,' way") (quoting *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 496 (2005)). If Mr. Tunis's argument were correct, no amphibious vehicle that is capable of being operated on water would be considered a motor vehicle. Thus, under part 4 of the regulations, owners of amphibious vehicles, for example, would not be required to report vehicle accidents resulting in property damage or personal injury to park officials (36 C.F.R. § 4.4), would not be prohibited from openly carrying alcohol while driving or indeed from being intoxicated while driving (*id.* §§ 4.14, 4.23), and would not be required to operate their vehicle safely on park roads (*id.* at § 4.22). And although the Iguana may not be able to drive as fast as a car, Mr. Tunis's interpretation would exclude even faster-moving amphibious vehicles from the definition of "motor vehicle"—they too would be *capable* of being operated on water, and thus excluded. Under Mr. Tunis's proposed construction, the "duck boats" sometimes found in waterfront tourist areas would not qualify as a "motor vehicle"—even when driving on

10

roads at traffic speed. *Cf. Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.*, 138 F. App'x 431, 432 (3d Cir. 2005) ("Ride The Ducks . . . operates a tourist attraction in Philadelphia using amphibious vehicles known as 'ducks boats.' These duck boats take tourists on a ride through the historic streets of Philadelphia and then enter the Delaware River via a ramp at the end of Race Street near the Benjamin Franklin Bridge for a water tour."). Although some of the conduct listed above may also be subject to state law or prohibited under other NPS regulations, the general implication is clear: the context and structure of part 4 confirm NPS's intent for "motor vehicle" to apply to powered vehicles when they are operated on land, as the Iguana was being operated when the citations here were issued.

In summary, the language, context and structure of the NPS regulations clearly establish that the Iguana is a motor vehicle when it is being operated on land, as it was when Mr. Tunis drove it up onto the foreshore at Assateague. Mr. Tunis offers two remaining arguments against this interpretation. Neither is successful.

First, Mr. Tunis argues that the Iguana "is a vessel, not a motor vehicle." ECF No. 4 at 8. As evidence of this, he notes that at least one of his citations described the Iguana as a "boat." *Id*. Mr. Tunis is correct that the Iguana is a "vessel" under that term's broad, capability-based definition in section 1.4 ("Vessel means every . . . description of watercraft . . . capable of being used[] as a means of transportation on the water."). Because the definition of "vessel" is explicitly based on capability, the Iguana remains a vessel regardless of whether it is operating on land or water at a given time. Mr. Tunis does not explain why the Iguana cannot be both a vessel and, when it is operated on land, a motor vehicle, too. Nothing in the regulation prohibits multiple simultaneous

11

classifications. Thus, the conclusion that the Iguana is not a motor vehicle does not follow from the premise that the Iguana is a "vessel."[3]

Second, Mr. Tunis similarly argues that an operating-status definition of "motor vehicle" is contrary to other characteristic-based definitions in the regulation and would lead to illogical consequences—for example, that airplanes and boats would cease to be "aircraft" and "vessels" when driven on land, and would instead be regulated as motor vehicles. ECF No. 4 at 9. But again, Mr. Tunis assumes without any authority that means of transportation are fixed in one category. Under the regulations, an aircraft does not stop being an aircraft when driven on a road, and neither does a vessel. But that is because the regulatory definitions of those means of transport are broad: "Aircraft" is defined as "a device that is used or *intended to be used* for human flight in the air" and "vessels" include craft "*capable of being used*[] as a means of transportation on the water." 36 C.F.R. § 1.4 (emphasis added). The "operated on . . . water" exclusion for motor vehicles does not use similarly broad language focused on immutable capabilities

---

[3] This conclusion is also consistent with the Supreme Court's analysis and holding in *Lozman*. There, the question was whether a "home consist[ing] of a houselike plywood structure with French doors on three sides" constructed atop an "empty bilge space underneath the main floor" that "kept it afloat" was a "vessel," which in that context Congress has defined as a "'watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.'" 568 U.S. at 118 (quoting 1 U.S.C. § 3). That "floating home," although capable of floating, was not capable of "being used . . . as a means of transportation on water," 1 U.S.C. § 3, because it had no motor or other way to propel itself (it had to be towed to be moved anywhere) and was not otherwise "designed to a practical degree for carrying people or things over water." *Id.* at 121; *see also id.* at 121–30 (analyzing the text, structure and purpose of the relevant statute, language from other statutes, and cases interpreting similar statutory language). Here, there is no dispute that Mr. Tunis's Iguana was capable of being operated on land; that is how it got onto the foreshore, and the mode in which it was being operated at the time these citations were issued.

12

or design, as explained above. Pilots must both follow the regulations for "aircraft" generally and, if they were to drive their planes on national park land, must obey the regulations for motor vehicles. So too for Mr. Tunis's Iguana.

### B.     The foreshore is within the scope of the NPS traffic regulations

Mr. Tunis also argues that, even if the Iguana was a motor vehicle, section 4.10 does not apply to him because the foreshore is not owned by the federal government. As noted above, the parties have stipulated that the Iguana was on the foreshore of the beach, which is titled to Maryland. Relying on two district court cases from the Ninth Circuit, Mr. Tunis contends that (a) NPS regulations can only be enforced on land that is federally *owned* unless their scope is explicitly extended to reach conduct on state- or privately-owned land; and (b) section 4.10 lacks any such statement, so it does not apply to the Maryland-owned portions of Assateague, including the foreshore. The two cases he relies on are *United States v. Mendez Concrete*, Case No. 07-cr-767-RCF, 2009 WL 733881 (C.D. Cal. Mar. 16, 2009) and *United States v. Grant*, 318 F. Supp. 2d 1042, 1045 (D. Mont. 2004).

As an initial matter, by relying on *Mendez Concrete* and *Grant*, the argument conflates the question of whether land is part of a national park with the question of who owns land *within* a national park. In *Mendez Concrete*, the government charged a concrete company with having caused a wildfire that burned tens of thousands of acres of the Los Padres National Forest. But the company was located outside the boundaries of the national park—on land that was neither federally owned nor within a federal park. Thus, the question arose whether the pertinent Department of Agriculture regulations applied to conduct outside a national park that caused harm within a national park—in other words, whether the regulation "reaches conduct on non-federal land." 2009 WL

13

733881, at *2. That issue took on a constitutional dimension because "[t]he Property Clause, U.S. Const. art. IV, § 3, cl. 2, authorizes the Secretary [of Agriculture] 'to regulate conduct on non-federal land when reasonably necessary to protect adjacent federal property.'" *Id.* (quoting *United States v. Arbo*, 691 F.2d 862, 865 (9th Cir. 1982)). That court held that the regulation at issue (about causing timber, etc., "to burn except as authorized by permit, 36 C.F.R. § 261.5(c)) was "not intended to apply to conduct on adjacent non-federal property." 2009 WL 733881, at *4. In context, "non-federal property" referred to property outside the boundaries of a national park. So too in *Grant*, where "all of the fires set by Grant were on state lands"—land that was not only not *owned* by the federal government, but outside the boundaries of any "federal lands." 318 F. Supp. 2d at 1043, 1044. Accordingly, the analysis in *Mendez Concrete* and *Grant* has no bearing on the question here, where the conduct at issue undisputedly occurred within a national park.

Beyond the distinctions between those cases and this case, the NPS regulations *do* contain a clear statement of scope that reaches Assateague Island's state-owned foreshore. NPS regulations expressly apply to "all persons entering, using, visiting, or otherwise within . . . [w]aters subject to the jurisdiction of the United States located within the boundaries of the National Park System." 36 C.F.R. § 1.2(a)(3). That "includ[es]" not only "navigable waters" but also "areas within their ordinary reach (up to the mean high water line in places subject to the ebb and flow of the tide and up to the ordinary high water mark in other places)." *Id*. Section 1.2(a)(3) goes on to provide that other than in Alaska, the regulations apply "without regard to the ownership of submerged lands, tidelands, or lowlands." *Id*. The pertinent regulation, 36 C.F.R. § 4.1, explicitly adopts this scope provision for the traffic regulations contained in part 4,

14

including section 4.10 (the provision under which Mr. Tunis was charged): "[t]he applicability of the regulations in this part is described in § 1.2 of this chapter."

The foreshore is clearly encompassed within section 1.2(a)(3). The foreshore is within the "ordinary reach" of "[w]aters subject to the jurisdiction of the United States." Mr. Tunis does not dispute that the portion of the Atlantic Ocean within the Assateague Island National Seashore is water subject to the jurisdiction of the United States. His argument is that the regulation at issue does not apply to the state-owned land that becomes submerged at high tide (the foreshore). *See* ECF No. 4-1 at 12–13. But the foreshore is clearly an "area within" that water's "ordinary reach" because the regulation expressly includes submerged land "up to the mean high water line in places subject to the ebb and flow of the tide." 36 C.F.R. § 1.2(a)(3). The foreshore is also undisputedly "within the boundaries of the National Park System," because the entire area is part of the Assateague Island National Seashore, even if the foreshore and submerged lands are titled to Maryland. *See* ECF No. 7-2, 7-3. And finally, section 1.2(a)(3) extends to non-federally-owned lands, as it applies "*without regard* to the ownership of submerged lands, tidelands, or lowlands." 36 C.F.R. § 1.2(a)(3) (emphasis added). This is the clear statement of extended scope that Mr. Tunis contends is missing: section 1.2(a)(3) extends the scope of NPS regulations to foreshore areas regardless of who owns those areas. The text of 36 C.F.R. § 1.2(a)(3) applies NPS regulatory authority, including its authority under section 4.10, to the foreshore at issue here.[4]

---

[4] The foreshore of Assateague Island is also within the scope of the regulation pursuant to 36 C.F.R. § 1.2(a)(2). That provision extends NPS's regulatory authority to the "boundaries of lands and waters administered by the National Park Service for public-use purposes pursuant to the terms of a written instrument." As noted above, Maryland and the federal government entered into an agreement establishing "concurrent

The only case addressing the scope of section 4.10 that the parties have cited or of which the Court is aware holds similarly. In *United States v. Carstens*, 982 F. Supp. 2d 874 (N.D. Ind. 2013), the Defendant used an all-terrain vehicle on a beach on the shore of Lake Michigan to tow a personal watercraft. He was cited under section 4.10 for operating the all-terrain vehicle and under 36 C.F.R. §§ 3.8 and 3.9 for improper use of the personal watercraft. *Id.* at 877. The beach included "land between the edge of the water of Lake Michigan and the ordinary high water mark" that was "held in public trust by the State of Indiana." *Id.* at 878. Even though the beach area in question was not owned by the federal government, it was within the boundaries of the Indiana Dunes National Lakeshore Park. *Id.* at 877–78. The *Carstens* court cited 36 C.F.R. § 1.2(a)(3) and held that "[t]he National Park Service had and has jurisdiction to regulate that beach area and properly had and has legal jurisdiction to enforce its regulations at that beach area." *Id.* at 878. Mr. Tunis claims that the jurisdictional analysis in *Carstens* only applied to boating regulations because the Defendant was cited for violations of part 3. ECF No. 10 at 10–11. But *Carstens* did not analyze parts 3 and 4 differently, likely because both incorporate the same scope provision: 36 C.F.R. § 1.2. *Compare* 36 C.F.R. § 3.1 *with* 36 C.F.R. § 4.1. As *Carstens* indicates, section 1.2(a)(3) reaches foreshore

---

jurisdiction" over the Assateague Island National Seashore, among other lands. ECF No. 7-4 at 2, 4. This agreement "vest[s] in the State of Maryland *and the United States* all the rights accorded a sovereign with the broad qualifications that such authority is held concurrently over matters including but not limited to criminal law [and] police powers[.]" *Id.* at 3 (emphasis added). The NPS administers Assateague Island for purposes of the public national park, and its authority is pursuant, at least in part, to this written agreement. Thus, the foreshore is also within the scope of NPS authority under section 1.2(a)(2).

areas that are within national park boundaries even if they are not owned by the federal government.

This conclusion is further confirmed by *Sturgeon v. Frost*, a case that twice went to the Supreme Court on the question of whether Mr. Sturgeon could use a hovercraft for moose hunting on national parkland in Alaska. *Sturgeon v. Frost*, 577 U.S. 424 (2016) ("*Sturgeon I*"); *Sturgeon v. Frost*, 587 U.S. 28 (2019) ("*Sturgeon II*"). This is where the carve-out in § 1.2(a)(3) for Alaska is illuminating. As noted above, the NPS regulations apply to, among other areas, "[w]aters subject to the jurisdiction of the United States within the boundaries of the National Park System . . . *without regard to the ownership of submerged lands, tidelands, or lowlands.*" 36 C.F.R. § 1.2(a)(3) (emphasis added). That last part, as explained above, is incompatible with Mr. Tunis's argument that the foreshore's ownership by the State renders the NPS regulations inapplicable. But that same regulatory phrase, emphasizing that NPS regulations apply "without regard" to the ownership of submerged lands, expressly does not apply "in Alaska." "Alaska is often the exception, not the rule." *Sturgeon I*, 577 U.S. at 440. In *Sturgeon*, the hunter was driving his hovercraft within a national park (the Yukon–Charley Rivers National Preserve) on land owned by the State of Alaska (the Nation River). Because this was in Alaska, 36 C.F.R. § 1.2(a)(3) did not apply, and ownership did matter. *Sturgeon II*, 587 U.S. at 46. But "[i]f Sturgeon lived in any other state, his suit would not have a prayer of success"—meaning, anywhere other than Alaska, the ownership of land within national parks does *not* affect whether NPS regulations apply. Although the Supreme Court's "prayer of success" comment was dicta, its reasoning was clearly correct, and further illustrates why Maryland's ownership of the Assateague foreshore does not render the foreshore outside the reach of the NPS regulations.

17

Mr. Tunis offers many counterarguments and alternative framings, but none succeed. Mr. Tunis first contends that 36 C.F.R. § 4.1 creates a more limited, specific jurisdictional reach for part 4 as compared to section 1.2. This is belied by the plain language of the regulation. Section 4.1 states as follows:

> The applicability of the regulations in this part is described in § 1.2 of this chapter. The regulations in this part also apply, regardless of land ownership, on all roadways and parking areas within a park area that are open to public traffic and that are under the legislative jurisdiction of the United States.

Mr. Tunis contends that the second sentence operates to limit the broader grant of jurisdictional applicability to non-federally-owned land contained in Section 1.2. ECF No. 4 at 16–18. Emphasizing the canon of statutory construction that specific provisions control over more general provisions, Mr. Tunis contends that "NPS explicitly considered whether the Vehicles and Traffic Safety regulations would apply on non-federal lands within park areas, and extended jurisdiction only to 'roadways and parking areas within a park area that are open to public traffic and that are under the legislative jurisdiction of the United States.'" ECF No. 10 at 8 (quoting 36 C.F.R. § 4.1).

But this analysis leaves out the word "also." The second sentence of section 4.1 does not *limit* the scope of section 1.2. Instead, it is additive. The jurisdictional scope articulated in section 4.1 extends as far as section 1.2 reaches, *and also* extends to roadways and parking areas that are not federally owned but are within park boundaries. Such an addition is not surplusage when compared to section 1.2(a)(1), which does not specify whether the regulations apply to roadways within national parks that are not *owned* by the federal government. Because section 4.1 incorporates section 1.2 without limits, and because section 1.2(a)(3) clearly encompasses foreshore areas

18

that are within park boundaries regardless of whether they are owned by the federal government, 36 C.F.R. § 4.10 applies to the area of the beach below the high-water mark upon which Mr. Tunis parked the Iguana.

Mr. Tunis also argues that section 1.2(a)(3) does not allow enforcement because it was only intended to regulate boating and water-based activities. *See* ECF No. 4 at 15–18. But the text of section 1.2(a)(3) is clear. It extends the regulatory scope not only to waters, but also to "areas within [the water's] ordinary reach (up to the mean high water line in places subject to the ebb and flow of the tide and up to the ordinary high water mark in other places) and, except in Alaska, without regard to the ownership of submerged lands, tidelands, or lowlands." 36 C.F.R. § 1.2(a)(3). There is no ambiguity: the plain text of the regulation explicitly includes the foreshore where Mr. Tunis was operating his Iguana.

### C.     Lenity

Finally, Mr. Tunis argues that even if operating the Iguana on the Assateague Island foreshore violates 36 C.F.R. § 4.10, he should prevail under the rule of lenity.

"The rule of lenity guides courts to 'strictly construe' criminal statutes and avoid interpreting them to 'extend criminal liability beyond that which Congress has plainly and unmistakably proscribed.'" *United States v. Kuehner*, 126 F.4th 319, 328 (4th Cir.) (quoting *United States v. Hilton*, 701 F.3d 959, 966 (4th Cir. 2012)). The rule of lenity applies equally to regulations. *See, e.g.*, *United States v. Greene*, Case No. 23-cr-52-RDA, 2025 WL 310128, at *5 (E.D. Va. Jan. 27, 2025) (applying lenity to a regulatory offense). But "[t]he rule of lenity is a last resort, not a primary tool of construction." *Hosh v. Lucero*, 680 F.3d 375, 383 (4th Cir. 2012) (quoting *United States v. Ehsan,* 163 F.3d 855, 858 (4th Cir. 1998)). "It only applies when courts 'can make no more than a

19

guess as to what Congress intended' and there is a 'grievous ambiguity or uncertainty in the statute.'" *Bonnie v. Dunbar*, 157 F.4th 610, 618 (4th Cir. 2025) (quoting *Muscarello v. United States*, 524 U.S. 125, 138–39 (1998)). "[L]enity . . . has [no] role to play where 'text, context, and structure' decide the case." *Bondi v. VanDerStok*, 604 U.S. 458, 484 (2025) (quoting *Van Buren v. United States*, 593 U.S. 374, 393–394 (2021)).

The ambiguities here are not grievous. The definition of "motor vehicle" contains some ambiguities, but any doubts are resolved by considering the text, context, and structure, as discussed above. After all, the rule of lenity "is not triggered . . . by the 'simple existence of some statutory ambiguity' given that 'most statutes are ambiguous to some degree.'" *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020) (quoting *Muscarello*, 524 U.S. at 138). And section 4.10's scope is not ambiguous at all given the text of 36 C.F.R. §§ 1.2 and 4.1, which combine to extend the regulation's reach to the foreshore areas within park boundaries, regardless of whether the underlying land is owned by the federal government or the state. Because the Court can readily ascertain the meaning of the regulations by applying the normal canons of statutory construction, there is no basis for reversing the conviction under the rule of lenity.

## III. CONCLUSION

For the foregoing reasons, the convictions are AFFIRMED. A separate order will follow.

Date: January 29, 2026

_____/s/_____
Adam B. Abelson
United States District Judge